**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

TIMOTHY MCANDREW,
Administrator of the Estate of
MEGHAN MCANDREW, Deceased,

Plaintiff,

v.

NORTHUMBERLAND COUNTY,
JAMES HOSKIN, and
JOHN DOES 1-6,

Defendants.

No. 4:22-CV-00834

(Chief Judge Brann)

**MEMORANDUM OPINION**

**JANUARY 17, 2024**

## I. BACKGROUND

Pending before the Court is the Defendants' Motion to Dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Now on the third iteration of this suit, Timothy McAndrew has sued Northumberland County, Corrections Officer James Hoskin, and six unnamed Corrections Officers on behalf of his daughter, Meghan McAndrew, following her death by suicide at the Northumberland County Jail. The motion is now ripe for disposition; for the reasons that follow, it is granted in part and denied in part.

## II. DISCUSSION

### A. Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[1] and *Ashcroft v. Iqbal*,[2] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[3] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[4]

### B. Facts Alleged in the Second Amended Complaint

The facts alleged in the Second Amended Complaint, which this Court must accept as true for purposes of this motion, are as follows.

---

1 550 U.S. 544 (2007).

2 556 U.S. 662 (2009).

3 *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

4 *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

### 1. The Intake Process and Suicide Watch Protocol

As noted above, Timothy McAndrew ("Mr. McAndrew") is the father of the deceased, Meghan McAndrew ("Ms. McAndrew").[5] After being taken into custody on February 6, 2022, the Northumberland County Jail (the "Jail") housed Ms. McAndrew until her death five days later.[6] During the intake process, Ms. McAndrew indicated that she was an addict and that she had used drugs earlier that day.[7] Due to a prior incarceration, the Jail was also aware that she had a history of mental illness, including a suicide attempt and a stint in a psychiatric facility.[8] The Jail subsequently placed Ms. McAndrew on suicide watch and gave its staff "certain 'alerts,' including that she was to be placed in a cell with only a low bunk and [that] she was to be checked every" fifteen minutes.[9] Despite this, her cell had both a top and bottom bunk.[10]

### 2. Ms. McAndrew's Suicide

Jail staff last checked on Ms. McAndrew at 9:26 a.m. on February 11, 2022[11] and then failed to perform nine suicide watch checks.[12] While unsupervised, Ms. McAndrew "fashioned her bedsheet into a noose" and proceeded to hang herself

---

5 *See* Doc. 31 (Second Amended Compl.) ¶ 2.
6 *See id.* ¶ 11
7 *See id.* ¶¶ 13-16.
8 *See id.* ¶¶ 20-22.
9 *Id.* ¶ 17.
10 *See id.* ¶ 18.
11 *See id.* ¶ 40.
12 *See id.* ¶ 41.

"from the top bunk in her cell."[13] Inmates alerted Corrections Officer ("CO") Hoskin "that something was wrong with Ms. McAndrew" at 11:52 a.m. and she was pronounced dead after being transported to a hospital.[14]

### 3. Other Suicides

Ms. McAndrew is not the Jail's first inmate suicide. Mr. McAndrew identified three suicides that occurred at the Jail before his daughter's death. Andrew Beers committed suicide at the Jail on August 13, 2013; no further details regarding the circumstances of his death were provided.[15] On June 15, 2014, Cyrus Lewis "was supposed to be on [fifteen]-minute suicide checks" but "was discovered by other inmates approximately one hour after he was last checked by a CO."[16] Mr. Lewis had been "housed alone and [had] placed a sheet in front of the window to his cell and no CO noticed this for at least one hour until he was discovered by another inmate."[17] Finally, Sean Beers committed suicide on September 15, 2021 by "hanging himself using the bedsheets provided to him by the Jail."[18] It is not stated whether Mr. Beers was on suicide watch, but it is alleged that no investigation occurred and no remedial actions were taken following his suicide.[19]

---

13 *Id.* ¶ 42.
14 *Id.* ¶ 40, 43.
15 *See id.* ¶ 77.
16 *Id.* ¶ 78.
17 *Id.* ¶ 79.
18 *Id.* ¶¶ 23-24.
19 *See id.* ¶ 25.

### 4. Roles of the Defendants

Northumberland County ("the County") "owns, operates, manages, directs and controls the [Jail] and had the responsibility of adopting policies and implementing procedures and practices which would create an environment whereby inmates would be safe."[20] The Jail's COs "are required to monitor and ensure the safety of individuals identified as suicidal."[21] The investigative report into Ms. McAndrew's death further states that COs perform the suicide watch checks.[22] Hoskin and the six unnamed COs were on-duty the morning of Ms. McAndrew's suicide.[23]

### 5. Training in Place at the Jail

Mr. McAndrew contends that "the Jail did not have any consistent suicide prevention training in place" at the time of Ms. McAndrew's death.[24] It is further alleged that (1) only "some COs may have been shown a one-hour video on suicide prevention";[25] (2) the County "failed to provide COs with training regarding warning signs of potential suicides"[26] and (3) the "investigative report completed by [the] Northumberland County District Attorney's Office cited only one suicide

---

20 *Id.* ¶ 8
21 *Id.* ¶ 69.
22 *See id.* ¶ 74.
23 *See id.* ¶¶ 39-42.
24 *Id.* ¶ 65.
25 *Id.* ¶ 67.
26 *Id.* ¶ 70.

prevention-related policy in place for COs at the Jail: inmates identified as suicidal were to be checked by COs every fifteen" minutes.[27]

**C. Analysis**

The Court will first evaluate the constitutional violations asserted in Counts I and III of the Second Amended Complaint before proceeding to the state law claims brought in Counts II, IV, and V.

**1. Count I –Violation of the Eighth and Fourteenth Amendments Pursuant to Section 1983**

Ms. McAndrew's rights as a pretrial detainee are governed by the Fourteenth Amendment, not the Eighth Amendment.[28] The Court has previously concluded that Mr. McAndrew has satisfied the Third Circuit's three-prong test for determining if a pre-trial detainee's claim "arising from a jail suicide" violated the Fourteenth Amendment as asserted against the County and the unnamed COs.[29] The Court will therefore focus on Defendant Hoskin.

Although Hoskin's arguments concerning his lack of personal involvement in the constitutional violation and his entitlement to qualified immunity are not overly persuasive, he will nevertheless be dismissed with prejudice from this case. Mr.

27 *Id.* ¶74.
28 *See* Doc. 29 (Aug. 21, 2023 Memorandum Opinion) at 7.
29 *Id.* at 12-13.

McAndrew failed to respond in his Opposition Brief to any of Hoskin's arguments and in fact endorses his dismissal.[30]

### 2. Count III – *Monell* Claim

The Court will instead turn its attention to the *Monell* claim asserted against the County in Count III.[31] "Courts have recognized two avenues to municipal liability under *Monell*."[32] "A municipality and its officials acting in their official capacities can be sued directly under § 1983 only if an action pursuant to a municipal policy, practice or custom directly causes a constitutional tort."[33] "A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice."[34]

As noted above, the Court has already concluded that Mr. McAndrew has plausibly asserted a constitutional violation of Ms. McAndrew's Fourteenth

---

30 *See* Doc. 34 (Brief in Opposition to Motion to Dismiss for Failure to State a Claim to Second Amended Compl.) at 6.

31 If Mr. McAndrew were to pursue a claim against the unnamed COs in their official capacities, these claims would be duplicative of the *Monell* claim asserted against the County. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). Further, the *Monell* framework is inapplicable to the unnamed COs when they are sued in their personal capacities as *Monell* is a vehicle for municipal liability. *See id.* The appropriate claim against these individuals is the Fourteenth Amendment violation pursuant to § 1983 as asserted in Count I of the Second Amended Complaint. As such, the unnamed COs will be dismissed with prejudice from Count III of the Second Amended Complaint.

32 *Alexander v. Bucks Cnty.*, Civ. A. No. 21-CV-4633, 2023 U.S. Dist. LEXIS 76883, at *15-16 (E.D. Pa. May 2, 2023).

33 *Kelley v. Bradford Cnty.*, 3:07-CV-1531, 2010 U.S. Dist. LEXIS 27290, at *20 (M.D. Pa. Mar. 23, 2010).

34 *Alexander*, 2023 U.S. Dist. LEXIS 76883, at *16 (quoting *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019)).

Amendment rights against the County and the on-duty COs.[35] Under the *Monell* framework, this is not the end of the analysis; by contrast, it must also be determined whether Mr. McAndrew has adequately alleged that this constitutional violation was due to the County's failure to train its COs. "A municipality may be held liable for its failure to train employees only where that failure amounts to 'deliberate indifference to the [constitutional] rights of persons'" its employees will "come in contact" with.[36] "Deliberate indifference is a stringent standard of fault 'requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'"[37] "There are two means of finding such deliberate indifference in a failure to train claim: (1) through a pattern of similar constitutional violations providing a municipal actor with notice; and (2) 'single-incident' liability."[38]

When asserting a failure to train claim based on a pattern of similar violations, deliberate indifference is sufficiently pled by showing "(1) municipal policymakers know that employees will confront a particular situation[,] (2) the situation involves a difficult choice or a history of employees mishandling[,] and (3) the wrong choice by an employee will frequently cause [the] deprivation of constitutional rights."[39]

---

35 *See* Doc. 29 (Aug. 21, 2023 Memorandum Opinion) at 12-13.

36 *Gaymon v. Esposito*, Civ. A. No. 11-4170, 2013 U.S. Dist. LEXIS 116159, at *45 (D.N.J. Aug. 16, 2013) (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)).

37 *Id.* (*quoting Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)).

38 *Id.* at *46.

39 *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Doe v. Luzerne Cty.*, 660 F.3d 169, 180 (3d Cir. 2011)).

"Further, causation between the noticed training deficiency and the injury must be shown."[40]

In the limited circumstances where a single incident is sufficient to put a municipality on notice, "the need for training 'can be said to be so obvious that [a municipality's] failure to do so could properly be characterized as deliberate indifference to constitutional rights.'"[41] The "risk of injury must be a 'highly predictable consequence' of the municipality's failure to train and supervise its employees."[42] "Even if that showing can be made, the plaintiff still must demonstrate that the failure to train 'proximately caused [the] constitutional injury by identifying a particular failure in a training program that is closely related to the ultimate injury.'"[43]

Although Mr. McAndrew has now provided information regarding three other suicides, as previously noted by the Court,[44] a failure to train claim through a single incident remains the "most viable *Monell* theory to come from the" allegations.[45]

---

40 *Gaymon*, 2013 U.S. Dist. LEXIS 116159, at *47.

41 *Alexander*, 2023 U.S. Dist. LEXIS 76883, at *23 (quoting *City of Canton*, 489 U.S. at 390 n. 10).

42 *Santiago v. City of Harrisburg*, Civ. No. 1:19-CV-898, 2020 U.S. Dist. LEXIS 50359, at *29 (M.D. Pa. Mar. 20, 2020) (quoting *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 225 (3d Cir. 2014)).

43 *Id.* at *29 (quoting *Buoniconti v. City of Philadelphia*, 148 F. Supp. 3d 425, 441 (E.D. Pa. 2015)).

44 *See* Doc. 29 (Aug. 21, 2023 Memorandum Opinion) at 20.

45 *Id.* This conclusion is supported by a comparison to other prison suicide cases. The Western District of Pennsylvania concluded that "one suicide and two, or perhaps four, suicide attempts" prior to the decedent's suicide "hardly constitutes a spate." *Herman v. Clearfield Cnty.*, 836 F. Supp. 1178, 1189 (W.D. Pa. 1993).

Mr. McAndrew's averments in the Second Amended Complaint satisfy the "first hurdle" of such a claim: it is highly predictable that inmates on suicide watch in a significantly understaffed jail would be neglected.[46] In fact, "after ignoring Ms. McAndrew for hours, COs were not even the ones to find that she had taken her life[;]" her "fellow inmates noticed something was wrong and had to alert" Hoskin.[47] Thus, the on-duty "COs completely abandoned an at-risk inmate for hours when she most required supervision."[48] This is particularly confounding given that at least one other suicide happened under nearly identical circumstances: an individual on suicide watch used Jail-provided bedsheets to facilitate their suicide after COs failed to perform the suicide watch checks.[49] These allegations are sufficient, at this stage of the proceeding, to satisfy this initial requirement.

To successfully plead causation, Mr. McAndrew must identify "the training program that the plaintiff believes is deficient, describe that deficiency, and explain how the deficiency caused the" injuries.[50] Notably, the Second Amended Complaint

---

46 Doc. 29 (Aug. 21, 2023 Memorandum Opinion) at 20-21.

47 *Id.* at 21.

48 *Id.*

49 *See* Doc. 31 (Second Amended Compl.) ¶¶ 78-79. The Defendants outline at considerable length allegations they consider to be missing from the Second Amended Complaint. *See* Doc. 33 (Brief in Support of Motion to Dismiss for Failure to State a Claim to Second Amended Complaint) at 13, 17-18. While this information would indeed be relevant, it is not necessary at this stage of the proceeding. Further, much of the suggested information presumably would be in the Defendants' hands and only available through discovery.

50 *Alexander*, 2023 U.S. Dist. LEXIS 76883, at *25.

includes new allegations that directly respond to the issues identified by the Court in its August 21, 2023 Memorandum Opinion.[51]

First, Mr. McAndrew clarifies the role the County plays in managing the Jail: it "owns, operates, manages, directs and controls the [Jail] and had the responsibility of adopting policies and implementing procedures and practices which would create an environment whereby inmates would be safe."[52] Consequently, the County had the responsibility to ensure adequate training policies and programs existed at the Jail.

Next, Mr. McAndrew describes the relevant training programs related to suicide prevention and detecting suicide warning signs. He contends that the Jail lacked "any consistent suicide prevention training" before Ms. McAndrew's death.[53] Only "some COs may have been shown a one-hour video on suicide prevention"[54] and the COs received no "training regarding [the] warning signs of potential suicides."[55] The "investigative report completed by [the] Northumberland County District Attorney's Office [also] cited only one suicide prevention-related policy in place for COs at the Jail: inmates identified as suicidal were to be checked by COs

---

51 *See* Doc. 29 (Aug. 21, 2023 Memorandum Opinion) at 21.
52 Doc. 31 (Second Amended Compl.) ¶ 8.
53 *Id.* ¶ 65.
54 *Id.* ¶ 67.
55 *Id.* ¶ 70.

every fifteen" minutes.[56] Accordingly, Mr. McAndrew has identified with particularity the deficiencies in these training programs.

Finally, these inadequacies are then linked to Ms. McAndrew's death. Before her suicide, Ms. McAndrew slept for "long periods of time without any lights on in her cell," had "virtually no contact with other inmates" and suffered from withdrawal symptoms.[57] These "potential warning signs" leading up to her suicide "could have been identified if Northumberland County had provided its COs with suicide prevention training."[58] Further, it is alleged that the lack in training regarding "the necessary precautions to avoid [inmate] suicides" contributed to Ms. McAndrew's placement in a cell alone with access to supplies that facilitated her suicide and the corrections officers' failure to conduct the required suicide checks.[59] In light of these new allegations, the Court concludes that Mr. McAndrew has adequately pled a failure to train *Monell* claim against the County.

### 3. Wrongful Death and Survival Actions – Counts IV and V

The Defendants contend that the wrongful death and survival actions brought by Mr. McAndrew are barred by the Pennsylvania Political Subdivision Tort Claims Act" ("PSTCA"). The PSTCA "provides a general grant of immunity to political subdivisions, their departments and employees when acting in the scope of their

56 *Id.* ¶ 74.
57 *Id.* ¶¶ 29-31.
58 *Id.* ¶ 72.
59 *Id.*. ¶¶ 73, 84-85, 87, 112.

employment but provides limited exceptions for such recoveries against political subdivisions."[60]

"The Wrongful Death and Survival Act did not create a new theory of liability but merely allowed a tort claim of the decedent to be prosecuted."[61] "As a result, a plaintiff must state all the elements of a valid tort" to pursue these claims.[62] Here, Mr. McAndrew contends that he is permitted to proceed with the wrongful death and survival actions because he is alleging constitutional violations pursuant to § 1983.[63] Neither the Supreme Court of the United States nor the Third Circuit have decided "whether § 1983, independently or in conjunction with state law, may be used by survivors when the decedent's death resulted from a constitutional violation."[64] Although "differing results" have been reached in this Circuit, "I shall take the same approach as the Honorable Lawrence F. Stengel [in the Eastern District of Pennsylvania] did in *Moyer v. Berks Heim Nursing Home*," and "I will allow these claims to proceed."[65] "After discovery, the parties may address the propriety of these claims."[66]

---

60 *DeJesus v. City of Lancaster*, Civ. A. No. 14-CV-3437, 2015 U.S. Dist. LEXIS 32453, at *6 (E.D. Pa. Mar. 17, 2015).

61 *Ferencz v. Medlock*, 905 F. Supp. 2d 656, 674 n. 10 (W.D. Pa. 2012).

62 *Id.*

63 *See* Doc. 34 (Brief in Opposition to Motion to Dismiss for Failure to State a Claim to Second Amended Compl.) at 15-16.

64 *DeJesus*, 2015 U.S. Dist. LEXIS 32453, at *7 (citing *Berry v. City of Muskogee, Okl.*, 990 F.2d 1489, 1502 (10th Cir. 1990) and *Moyer v. Berks Heim Nursing Home*, Civ. A. No. 13-CV-4497, 2014 U.S. Dist. LEXIS 36600 (E.D. Pa. 2014)).

65 *Id.* at *7.

66 *Id.*

#### 4. Count II – Medical Negligence against the "Medical Defendants"

Mr. McAndrew has not identified whom the "Medical Defendants" are in the Second Amended Complaint.[67] He will be given two weeks from the date of the accompanying Order to show cause as to why this claim shall not be dismissed with prejudice.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted in part and denied in part. Except to show cause regarding the potential dismissal of the unidentified "Medical Defendants," Mr. McAndrew will not be provided any further opportunities to amend this complaint.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

67 *See* Doc. 33 (Brief in Support of Motion to Dismiss for Failure to State a Claim to Second Amended Compl.) at 19. The "Medical Defendants" similarly were unidentified in the First Amended Complaint. *See* Doc. 20 (First Amended Compl.) ¶¶ 84-87.